**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-CR-20066-001 |
| | ) | |
| ASHANTAE CORRUTHERS, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE**
**DEFENDANT'S COMMENTARY ON SENTENCING FACTORS**

NOW COMES the United States of America, by Gregory K. Harris, United States

Attorney for the Central District of Illinois, and Eugene L. Miller, Assistant United States

Attorney, and hereby submits its response to Defendant Ashantae Corruthers's

commentary on sentencing factors, R. 91.

## BACKGROUND[1]

The defendant, Ashantae Corruthers, and her co-defendant, Regina Lewis,

unlawfully purchased and transferred a Glock, Model 48, nine-millimeter, semiautomatic

pistol and nine-millimeter ammunition to convicted felon Darrion Lafayette in exchange

for $100 each. After they learned that Lafayette had discharged the firearm in

Champaign, Illinois, Corruthers falsely reported to the Indianapolis Metropolitan Police

Department that the firearm had been stolen from her.

---

[1] This information is detailed in the Presentence Report (PSR).

On May 19, 2021, Lafayette used the illegally acquired Glock pistol to shoot Champaign Police Officers Christopher Oberheim and Jeffrey Creel, striking them both and killing Officer Oberheim. Officer Creel was able to return gunfire, killing Lafayette. During the subsequent investigation into the deaths of Officer Oberheim and Lafayette, Corruthers obstructed justice by falsely claiming that she did not know Lafayette and repeating the lie that the Glock pistol had been stolen from her.

In her sentencing commentary, Corruthers requests a sentence of 18 months of probation with a condition of home detention. Such a sentence would deprecate the seriousness of Corruthers's offenses, result in an unwarranted disparity with her co-defendant's sentence, and fail to deter others from similar conduct. This Court sentenced co-defendant Lewis to 102 months of imprisonment. The United States submits that a sentence of imprisonment for Corruthers is also warranted and necessary pursuant to the sentencing factors set forth in 18 U.S.C. § 3553(a). The United States herein recommends the same sentence that it recommended for co-defendant Lewis, that is, a sentence of 108 months of imprisonment, to be followed by a three-year term of supervised release, no fine, and a $200 special assessment.

## THE APPLICABLE SENTENCING GUIDELINES

## I. Objections That Need Not Be Further Addressed At Sentencing

### A. Victim Determination

Corruthers argues that Officers Oberheim and Creel were not victims of her conduct in conspiring with Lewis and Lafayette to illegally provide Lafayette with a firearm and then obstruct justice to cover it up. R. 91 at 7 ("While it is tragic that a family

2

lost a husband and father, that should not be laid at the feet of Ms. Corruthers.")
Paragraph 37 of the PSR agrees, stating that "[t]hese are Title 18 offenses, and there are
no victims in the offenses of conviction." The United States disagrees that Officers
Oberheim and Creel are not victims, although the Court need not make such a legal
determination, as it will not affect sentencing. Nonetheless, in explaining its
recommended sentence, the United States asserts that Officer Oberheim (and in turn,
Officer Oberheim's family members) and Officer Creel are victims of this offense. The
Crime Victims' Rights Act (CVRA) sets forth that "[t]he term 'crime victim' means a
person directly and proximately harmed as a result of the commission of a Federal
offense . . . ." 18 U.S.C. § 3771(e)(2)(A). Where a crime victim is deceased, the family
members may assume the crime victim's rights. § 3771(e)(2)(B).

"The CVRA, however, does not limit the class of crime victims to those whose
identity constitutes an element of the offense or who happen to be identified in the
charging document. The statute, rather, instructs the district court to look at the offense
itself only to determine the harmful effects the offense has on parties. Under the plain
language of the statute, a party may qualify as a victim, even though it may not have
been the target of the crime, as long as it suffers harm as a result of the crime's
commission." *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008) (finding petitioners were
victims under CVRA because the criminal activity directly and proximately harmed
them).

It is important to remember that Corruthers has not been convicted of simply
falsifying a Form 4473 or making a straw purchase; she has been convicted of conspiring

with both Lewis and Lafayette to illegally obtain and transfer the Glock firearm to convicted felon Lafayette and then to obstruct justice by covering up that illegal transfer. Thus, the question is whether Corruthers's ongoing conspiracies with Lewis and Lafayette directly and proximately harmed Officers Oberheim and Creel. When the question is correctly framed, the unequivocal answer is yes.

After all, in the civil context, courts have held that firearm sellers who illegally sell a firearm can be found under certain circumstances to have caused later harm that resulted from the use of the firearm:

> [W]e do not hold that the mere failure of Mrs. Carpenter to have Roy properly complete Form 4473 was, in itself, a "legal cause" of the homicide. This instead, is a factor to be considered along with other evidence to determine whether the salesperson should have recognized that Roy was mentally incompetent at the time of the sale of the pistol and ammunition. If so, the thrust of this opinion is to explain that this breach of her duty was a "legal cause" of the homicide and would render her employer liable.

*Phillips as Tutrix of Phillips v. Roy*, 431 So. 2d 849, 853 (La. Ct. App. 1983); *see also Olson v. Ratzel*, 278 N.W.2d 238, 250 (Ct. App. 1979) (holding that an injured plaintiff should be allowed to show probability of harm from an illegal sale of a handgun to a juvenile). In the criminal context, the State of Michigan recently held two parents criminally liable for giving their son a nine-millimeter semi-automatic pistol that was later used to shoot and kill multiple individuals under circumstances that suggested he might use the gun to harm someone. *People v. Crumbley*, 2023 WL 2617524, at *11 (Mich. Ct. App. Mar. 23, 2023), *appeal denied*, 995 N.W.2d 339 (Mich. 2023), and *appeal denied*, 995 N.W.2d 340 (Mich. 2023) (finding that "a juror could conclude that a reasonably foreseeable outcome of defendants' alleged gross negligence was EC committing a shooting . . . ").

4

Here, Corruthers not only knew that Lafayette was a convicted felon and was willing to break the law to obtain the firearm, she also falsely reported the firearm stolen because she later learned that Lafayette had discharged the gun. Under these specific circumstances, Lafayette's use of the firearm to shoot Officers Oberheim and Creel was reasonably foreseeable to Corruthers, making them both victims of her offenses.

Nonetheless, the Court need not resolve this objection under Rule 32(i)(3)(B) because resolution will not affect sentencing. Neither Officer Creel nor Officer Oberheim's family are seeking restitution, nor have any victim-related enhancements been applied by the PSR. Although Officer Creel and Officer Oberheim's family intend to submit letters to the Court discussing how Corruthers' crime has impacted them,[2] the Court has broad discretion to consider these letters regardless of whether the authors fall under the technical definition of a crime victim under the CVRA. *See Concepcion v. United States*, 597 U.S. 481, 491 (2022) (holding that federal courts have broad discretion to consider all relevant information at a sentencing hearing); *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012) ("During sentencing, evidentiary standards are relaxed; a sentencing court can consider relevant information without regard to its admissibility under the rules of evidence as long as the information has a sufficient indicia of reliability to support its probable accuracy.") (internal quotations omitted); *cf.* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the . . . conduct of a

---

[2] Officer Creel and Officer Oberheim's daughters read these letters, without objection, at the sentencing of co-defendant Lewis. Because the Court has already heard the letters read aloud and because of the emotional toil of reading the letters, the United States intends only to submit the written letters to the Court and defense counsel prior to Corruthers's sentencing, as indicated in paragraph 38 of the PSR.

person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").

B.      The USSG § 2J1.2(c) Cross Reference

At co-defendant Lewis's sentencing, the United States argued that the PSR should have applied the cross-reference found at Section 2J1.2(c). This Court rejected that argument and found that Section 2J1.2(c)'s cross-reference did not apply. Although Corruthers, as opposed to Lewis, directly obstructed justice by lying to both state and federal authorities, the United States acknowledges that it has no additional arguments that would justify the Court reexamining its prior ruling. *See, e.g., Lickers v. United States*, 2024 WL 1596908, at *5 (7th Cir. Apr. 12, 2024) (noting that, under the law of the case doctrine, "legal rulings rendered at one stage of a lawsuit should not, as a general matter, be reexamined in subsequent stages"). The United States details its prior argument herein only to preserve the argument for appeal and in support of its requested sentence under the Section 3553(a) sentencing factors in this case.

The United States agrees that the Presentence Report (PSR) correctly states in paragraph 42 that Count One (Conspiracy to Illegally Purchase and Transfer a Firearm) and Count Two (Conspiracy to Engage in Misleading Conduct) should "group" pursuant to Section 3D1.2, although the United States asserts the applicable provision is Section 3D1.2(b) (as opposed to subsection (c) cited by the PSR) because the counts involve the same victim and two or more acts connected by a criminal objective or constituting part of a common scheme or plan. *See* USSG § 3D1.2, comment. (n.4) (for example, directing grouping under Section 3D1.2(b) where "[t]he defendant is convicted

6

of one count of auto theft and one count of altering the vehicle identification number of the car he stole").

The United States disagrees, however, with the conclusion of the PSR in paragraph 43 that Count One (which carries a five-year maximum sentence), as opposed to Count Two (which carries a twenty-year maximum sentence), results in the highest offense level. Namely, as asserted, *infra*, Count One has a base offense level of 14 with a two-level increase for obstruction of justice, resulting in an adjusted offense level and total offense level of 16. The PSR, however, fails to calculate the offense level for Count Two. The United States submits that Count Two carries a higher offense level than Count One.

Namely, Section 2X1.1(a) states that the base offense level for conspiracy to engage in misleading conduct is the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. The base offense level for the substantive offense of engaging in misleading conduct is found at Section 2J1.2. In turn, the cross reference at Section 2J1.2(c) directs application of Section 2X3.1 (Accessory After the Fact) if the offense involved obstructing the investigation or prosecution of a criminal offense.

Here, Corruthers's conspiracy obstructed the investigation into the murder of Officer Oberheim and the shooting of Officer Creel.[3] It also obstructed the investigation

---

[3] At Lewis's sentencing, the United States presented the testimony of ATF Task Force Officer Cully Schweska to detail the investigation into the murder. It does not intend to present any additional testimony on this point at Corruthers's sentencing.

into whether the police-involved shooting of Lafayette was justified. Recall, at the time of this shooting, the killing of George Floyd was less than a year old. After Floyd's death, Champaign had endured a large and destructive riot. In this context, the deadly shooting of an African-American by a Caucasian police officer created a situation even more volatile than usual that required a prompt and thorough investigation. As part of that investigation being led by the Illinois State Police (ISP), agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) assisted ISP by tracing the Glock firearm found at the scene of the shooting to its original purchaser, Corruthers. Only two days after the shooting, ATF agents interviewed Corruthers, who falsely told the agents that she did not know Lafayette and that the Glock had been stolen. There is no doubt that Corruthers knew that this was a murder investigation, as the ATF agents told her that Officer Oberheim had been shot and killed with the firearm and the phone record evidence showed that Corruthers was aware that Lafayette had been shot and killed, as well.

Pursuant to Section 2X3.1(a)(1), the base offense level is six levels lower than the offense level for the underlying offense, which is level 43 for first degree murder pursuant to Section 2A1.1 The base offense level is then capped at 30 pursuant to Section 2X3.1(a)(3)(A). The base offense level of 30 is not reduced pursuant to Section 2X1.1(b)(2) because Corruthers completed all acts the conspirators believed necessary on their part for the successful completion of the substantive offense. Because the adjusted offense level of 30 for Count Two is greater than the adjusted level of 16 for Count One, level 30 is the offense level applicable to the group pursuant to Section 3D1.3(a).

8

The PSR improperly limits Corruthers's obstruction conspiracy to the unlawful purchase and transfer of the firearm, given that overt acts in furtherance of the conspiracy also involved statements to federal agents investigating the murder of Officer Oberheim and death of Lafayette. Numerous courts have applied the Section 2J1.2(c) cross reference under similar circumstances. For example, the First Circuit held that "the district court was justified in using murder, and not gun possession, as the underlying offense" under Section 2J1.2(c) where the defendant lied about his knowledge of guns that were used to commit murders. *United States v. Flemmi*, 402 F.3d 79, 95 (1st Cir. 2005). Citing to the Guidelines, the First Circuit noted that "[w]here there is more than one [potential underlying] offense, the most serious such offense . . . is to be used." *Id.* at 96 (quoting USSG § 1B1.5, comment. (n.3)). Similarly, the Ninth Circuit has held that "[i]f [a defendant] obstructed the prosecution of more than one offense, then § 1B1.5 requires the court to use the offense that results in the greatest offense level." *United States v. Arias*, 253 F.3d 453, 461 (9th Cir. 2001). Thus, the PSR misapplies the Guidelines by not using the most serious offense being investigated during the obstructive conduct. *See United States v. Connolly*, 341 F.3d 16, 31–33 (1st Cir. 2003) (finding no error where district court determined that first-degree murder was the "underlying offense" for purposes of USSG § 2J1.2(c) and § 2X3.1).

Moreover, a defendant's specific knowledge of the offense under investigation is irrelevant, as long as the defendant obstructed the investigation and the investigation was in respect to an underlying crime. *Flemmi*, 402 F.3d at 97 ("[n]othing more was required for murder to qualify as the underlying offense"). Of course, here, Corruthers

has acknowledged that she lied to the ATF Special Agent specifically because she "feared being charged with murder." R. 91 at 7. It is also irrelevant whether anyone was ultimately prosecuted for the underlying offense, as "the cross reference in § 2J1.2(c)(1) must be applied without regard to the defendant's guilt on the underlying offenses." *Arias,* 253 F.3d at 459. Thus, the cross reference applies not only because of the investigation of Officer Obeheim's murder, but also based on the investigation at the time into the circumstances of Lafayette's death.

After all, Section 2J1.2 itself states that the intent of the cross reference is to increase the penalty for obstruction for more serious offenses:

> Because the conduct covered by this guideline is frequently part of an effort . . . to assist another person to escape punishment for an offense, a cross reference to § 2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person.

USSG § 2J1.2, comment. (backg'd). "[T]he use of § 2X3.1 is intended not to treat the defendant as having committed the underlying offense, but to weigh the severity of one's actions in obstructing justice based on the severity of the underlying offense that was the subject of the [investigation] sought to be obstructed, impeded or influenced." *United States v. Brenson*, 104 F.3d 1267, 1285 (11th Cir. 1997) ("the purpose of the cross-referencing to § 2X3.1 is to provide proportionality in the sentencing of such offenses"). It is hard to imagine more serious or severe offenses than the murder of a police officer or the police-involved killing of a civilian:

> For example, obstructing a murder investigation is more serious than obstructing a trespassing investigation and warrants more severe

> punishment to discourage such obstruction, regardless of whether either
> investigation results in prosecution or conviction. Someone who obstructs a
> murder investigation risks severe punishment, even if he knows the suspect
> is innocent, because a murder investigation itself is a very serious thing and
> its obstruction cannot be tolerated.

*See United States v. Greer*, 872 F.3d 790, 798 (6th Cir. 2017) (affirming the district court's

application of § 2J1.2 cross reference and § 2X3.1 in calculating the defendant's advisory

guidelines for purposes of setting his sentence).

The PSR makes a crucial error in failing to apply the Section 2J1.2 cross reference.

In rejecting the government's objection, it relies on the Section 2X3.1 definition of

"underlying offense." This is error, however, because Section 2X3.1 is being applied

based on Section 2J1.2's cross reference, not because the defendants are accessories after

the fact under Section 2X3.1:

> Brenson then argues that the district court erred in applying § 2X3.1 as a
> cross-reference for determining his base offense level. The argument
> concerning the inapplicability of § 2X3.1 appears to be based on a lack
> of understanding as to how § 2X3.1 is applied in these types of cases. This court
> recently stated that "[t]he language of the cross-referencing provision
> [§ 2J1.2] is mandatory when the offense involves 'obstructing the
> investigation or prosecution of a criminal offense' without any qualification
> and without regard to whether defendant or anybody else was convicted of
> the underlying offense, or whether an offense could be shown to have been
> committed at all." *United States v. McQueen*, 86 F.3d 180, 182 (11th Cir. 1996).
> Pursuant to § 2J1.2, "a sentencing court *must* apply the cross-reference
> provision," when applicable. *McQueen,* 86 F.3d at 182 (emphasis added).

> In *United States v. McQueen*, the district court erroneously declined to apply
> the cross-referencing provision when sentencing the defendant as to his
> obstruction of justice offense because the defendant had been acquitted of
> the underlying offense (money laundering). 86 F.3d at 182–84. This court
> pointed out that the "district court erroneously focused on the definition of
> 'underlying offense' in § 2X3.1, which applies to a conviction as an accessory
> after the fact" and "[t]hat definition does not apply for cross-reference
> purposes." *Id.* at 183. Based on this same rationale, Brenson need not be

proven to be an accessory after the fact, because the application of § 2X3.1 is due to the cross-referencing requirement in § 2J1.2(c)(1) and not based on Brenson being treated as an accessory after the fact.

*Brenson*, 104 F.3d at 1285.

The only reason that ATF interviewed Corruthers on May 21, 2021, was because the gun she had purchased was used to murder Officer Oberheim and was possessed by Lafayette when he was killed. ATF was not conducting a straw purchaser investigation at that time; it was assisting the Illinois State Police in its murder and police-shooting investigations. Because Corruthers' conspiracy to obstruct justice included false statements to ATF special agents investigating the murder of Officer Oberheim and the police-involved killing of Lafayette, Section 2J1.2(c) directs that Section 2X3.1 be applied in respect to the criminal offenses being investigated, and Section 1B1.5 directs the Court to use the most serious offense under investigation, *i.e.*, first-degree murder.

## II.   PSR Objections To Be Resolved At Sentencing

### A.   Base Offense Level

Paragraph 44 of the PSR correctly states that, pursuant to Section 2X1.1(a), the base offense level for Corruthers's conspiratorial conduct should be determined under Section 2K2.1. Nonetheless, the PSR incorrectly applies Section 2K2.1(a)(7) to find a base offense level of 12, when the base offense level should be 14 pursuant to Section 2K2.1(a)(6).

More specifically, Corruthers was indicted and convicted of conspiring to commit offenses in violation of 18 U.S.C. § 922(a)(6) (false statements in acquisition of a firearm) and 18 U.S.C. § 922(d) (unlawfully disposing of a firearm to a prohibited person). R. 1.

12

Section 2K2.1(a)(6)(B) applies a base offense level of 14 if a defendant is convicted under 18 U.S.C. § 922(d), and Section 2K2.1(a)(6)(C) applies a base offense level of 14 if a defendant is convicted under 18 U.S.C. § 922(a)(6) and committed the offense with knowledge that the offense would result in the transfer of a firearm to a prohibited person. Thus, each of these subsections provides an independent basis for applying a base offense level of 14, rather than 12.

It matters not that Corruthers was convicted of a conspiracy under Section 371 rather than the substantive offenses under Sections 922(a)(6) and (d). In fact, that is the whole point of Section 2X1.1(a). It applies the guideline for the "substantive offense," which the Guidelines define as "the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit. Under §2X1.1(a), the base offense level will be the same as that for the substantive offense." U.S.S.G. § 2X1.1, comment. (n.2). Here, the base offense level for the substantive offenses would be 14, so the base offense level for the conspiracy to commit those offenses is 14.

B.     Acceptance of Responsibility

Paragraph 48 of the PSR correctly applies a two-level increase for obstruction of justice under Section 3C1.1. Without further elaboration, paragraph 50 of the PSR then applies a two-level reduction for acceptance of responsibility under Section 3E1.1(a). Yet, the commentary to Section 3E1.1 states that "[c]onduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for [her] criminal conduct." U.S.S.G. § 3E1.1, comment. (n.4). The Seventh Circuit recently reconfirmed that the

13

Sentencing Commission's commentary interpreting or explaining a guideline is authoritative and entitled to controlling weight. *United States v. White*, 2024 WL 1395493, at *3 (7th Cir. Apr. 2, 2024) (citing *Stinson v. United States*, 508 U.S. 36 (1993)).

Although the commentary permits adjustments for both obstruction of justice and acceptance of responsibility in "extraordinary cases," the PSR offers no such extraordinary reasons to support an adjustment under both provisions in Corruthers's case. To the contrary, she not only obstructed justice by falsely reporting the Glock firearm stolen on April 26, 2021, she then repeated that false story on May 21, 2021, even after she knew that Officer Oberheim had been shot and killed with the firearm. After being charged by complaint on September 30, 2022, Corruthers publicly acknowledged her criminal conduct for the first time at her change of plea hearing on June 22, 2023.[4] Thus, the record reflects that Corruthers is motivated as much by a self-serving desire to minimize her own punishment as she is by genuine and sincere remorse for her conduct. *See United States v. Major*, 33 F.4th 370, 382 (7th Cir.), *cert. denied*, 143 S. Ct. 259 (2022). In fact, in her commentary, she admitted being driven by a desire to avoid punishment by claiming that she lied to federal officers because "[s]he feared being charged with murder."[5] R. 91 at 7.

---

[4] This distinguishes Corruthers from co-defendant Lewis, who pleaded guilty pursuant to a cooperation agreement with the United States, agreed to testify against Corruthers (whose case was still pending at the time), and waived her rights to appeal and collateral attack.

[5] The ATF agent who interviewed Corruthers initially believed she was telling the truth about the gun being stolen because she cried when confronted with Officer Oberheim's death. Corruthers's commentary establishes that she cried and lied because of her concern that she might get caught and punished.

Corruthers bears the burden of proving her acceptance of responsibility by a preponderance of the evidence. *Major,* 33 F.4th at 382. Yet, in her commentary, Corruthers disavows any responsibility – moral or legal -- for the death of Officer Oberheim, arguing "a murder [] occurred that [she] is not responsible for," "[a]n individual's actions may have unintended consequences" and that the loss to Officer Oberheim's family "should not be laid at [her] feet." R. 91 at 2, 7. She also blames her coconspirator for her involvement and argues she "would not have become involved in this offense if not for Ms. Lewis." *Id.* In support of her argument, her commentary included the Court's comment during Lewis's sentencing that "*arguably*, you're more culpable than Corruthers, but that's not – she's not being sentenced today." *Id.* at 6 (emphasis added). Nonetheless, it is also arguable that Corruthers is *more* cuplable than Lewis because (1) the straw purchase could not have occurred without Corruthers because Lewis and Lafayette both were convicted felons; and (2) the false statements to both state and federal authorities were made by Corruthers, not Lewis.

More to the point, this is precisely the type of minimization that the Seventh Circuit in *Major* found supported the district court's denial of credit for acceptance of responsibility where a defendant sold drugs that resulted in the death of a customer. In *Major*, like here, the defendant minimized his conspiratorial conduct that resulted in the death of another individual. *Major*, 33 F.4th at 383 ("I can't believe that I'm honestly facing this much time when all I actually did was sell . . . two dime, three dime bags of dope for $50. That's what my conspiracy really consists of."). Moreover, in *Major*, like here, the defendant also obstructed justice. *Id.* (holding that the defendant's

minimization, "combined with the obstruction of justice finding, was more than sufficient for the court to conclude that Major had not accepted responsibility for his conduct").

C.      Guidelines Calculations

If the Section 2J1.2(c) cross reference were applied, Corruthers's adjusted offense level and total offense level would be 30 after application of Sections 2X1.1, 2J1.2, 2X3.1, and 3D1.2. With a criminal history of I, Corruthers's advisory guideline range would be 97 to 121 months. As with co-defendant Lewis, the sentence of 108 months of imprisonment recommended by the United States is within the guideline range that results from application of Section 2J1.2(c).

Based on the Court's prior ruling that Section 2J1.2(c) does not apply, however, the applicable base offense level should be 14 in paragraph 44, increased by two-levels for obstruction of justice in paragraph 48, for an adjusted offense level of 16 in paragraph 49, no reduction for acceptance of responsibility in paragraph 50, and a total offense level of 16 in paragraph 52. This would result in a guideline imprisonment range of 21 to 27 months in paragraph 86, which is in Zone D of the Sentencing Table[6] (and should be so noted in paragraphs 87 and 104 of the PSR), and a fine range of $10,000 to $95,000 in paragraph 107.

---

[6] Because Corruthers's guideline imprisonment range is in Zone D of the Sentencing Table, her request for probation with a condition of home detention would require a downward variance from the Guidelines. *See* U.S.S.G. § 5C1.1(f).

## <u>STATUTORY SENTENCING FACTORS</u>

The United States submits that, under the circumstances of this case, a sentence of 108 months of imprisonment is necessary to satisfy the sentencing factors found at 18 U.S.C. § 3553(a). A sentencing judge undertakes a two-step process when calculating a defendant's sentence. *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008). "The judge is first required to calculate the proper advisory guidelines range. Then, after hearing the parties' arguments, the judge must consider the factors enunciated in 18 U.S.C. § 3553(a) to decide whether the defendant's sentence should fall within that guidelines range." *Id.* (citation omitted) (citing *Gall v. United States*, 128 S. Ct. 586 (2007)). A reviewing court does not presume that an above-Guidelines sentence is unreasonable and gives deference to carefully explained variances. *See United States v. Gates*, 51 F.4th 271, 273 (7th Cir. 2022) (affirming upward variance in felon in possession case with a guideline range of 18 to 24 months of imprisonment)

Even though this Court has found that Sections 2X1.1, 2J1.2, 2X3.1, and 3D1.2 do not apply as asserted by the United States, the United States still submits that a sentence of 108 months of imprisonment is appropriate in this case. The Seventh Circuit has made it clear that, regardless of technical guidelines applications, a sentencing court must exercise its discretion under Section 3553(a) to arrive at the proper sentence. *See United States v. Carter*, 961 F.3d 953, 959 (7th Cir. 2020) (noting "a judge could sensibly ask why the abstract and hypothetical classifications" required by the Guidelines "should be deemed important in deciding an appropriate sentence in the particular defendant's case"). Moreover, a district court should consider an upward variance when the actual

17

conduct is not accounted for by the advisory guidelines. *See, e.g., United States v. Jerry*, 55 F.4th 1124, 1132 (7th Cir. 2022) (affirming significant upward variance where the district court explained that the Guidelines range did not account for the defendant's conduct and the impact that conduct had on the victims).

The Section 2K2.1 guideline applied by the U.S. Probation Office, rather than Section 2J1.2, woefully fails to address the serious nature of Corruthers's conduct in this case. The Seventh Circuit has previously affirmed an upward variance from those guidelines for a straw purchaser based on a district court's disagreement with the adequacy of Section 2K2.1 as applied to straw purchasers:

> The court explained that straw purchasers: (1) circumvent gun-control laws that prevent certain people from possessing firearms "for very valid reasons"; (2) "should be treated more severely than somebody who's just a felon in possession" because they enable multiple persons to break the law and harm the public; and (3) facilitate crime in the same way as a getaway driver, who is held responsible for acts of violence committed by others.

*United States v. Davis*, 795 F. App'x 970, 973 (7th Cir. 2019) (affirming upward variance and holding it would not substitute its judgment for the district court's policy disagreement with Section 2K2.1); *see also United States v. Madsen*, 809 F.3d 712, 719–20 (1st Cir. 2016) (affirming upward variance for straw purchaser where district court stated "I don't think the guidelines really adequately capture how—the significance of the harm that a person causes when they engage in the business of acquiring guns for resale through illegal means. I just think that the harm to the society is really great with that kind of offense.").

Corruthers argues that "[t]he government should not be able to ask for an above guidelines sentence solely on the basis that the range seems too low." R. 91 at 14. Corruthers's argument is contradicted by *Davis* and misapprehends the current state of sentencing law. A district court may vary from applicable sentencing guidelines based on a generalized policy disagreement with the Guidelines. *United States v. Jones*, 56 F.4th 455, 514 (7th Cir. 2022). Of course, here, the United States asserts that the sentence it is recommending is consistent with the policy considerations of the Guidelines as set forth in Section 2J1.2, even if the Court has found that the cross-reference does not technically apply.

## I.    Nature and Circumstances of the Offense

The nature and circumstances of this offense warrant a sentence of 108 months of imprisonment. It is beyond obvious that gun violence is one of the major problems facing our nation, our state, and our local communities, including Champaign-Urbana. According to the Centers for Disease Control and Prevention (CDC), more Americans (48,830) died of gun-related injuries in 2021, the year that Officer Oberheim and Darrion Lafayette were shot and killed, than in any other year on record.[7] The Seventh Circuit has repeatedly have held that district courts may consider the serious problem of gun violence in a jurisdiction in imposing stiff sentences on those who commit firearms offenses in that jurisdiction. *United States v. Hendrix*, 74 F.4th 859, 870 (7th Cir. 2023) (collecting cases).

---

[7] https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/

One way Congress has attempted to address the gun violence is to keep guns out of the hands of convicted felons, *see* 18 U.S.C. § 922(g)(1), and one way that ATF attempts to execute this law is to require purchasers to undergo background checks by federally licensed firearms dealers (FFLs) and swear under penalty of perjury that they are purchasing firearms for their own use, *see* ATF Form 4473. *See Abramski v. United States*, 573 U.S. 169, 172 (2014) (noting that "Federal law has for over 40 years regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands"). That prophylactic system is easily thwarted, however, when individuals are willing to break the law by being "straw purchasers," lying to FFLs, and transferring firearms to convicted felons. *Id.* at 193 ("No piece of information is more important under federal firearms law than the identity of a gun's purchaser—the person who acquires a gun as a result of a transaction with a licensed dealer"). Unfortunately, too many individuals – whether family members, romantic partners, or just friends – are willing to break the law and illegally purchase and transfer firearms.

Here, the nature of Corruthers's conspiracy to put a gun in convicted felon Lafayette's hand is particularly troubling. She did not act out of some misguided loyalty to Lafayette, like some family members do. Instead, she did it for profit. For the mere price of $100, she was willing to put everyone who came into contact with Lafayette at risk -- a risk that was realized on May 19, 2021, when he shot Officer Creel and took Officer Oberheim's life.

Moreover, Corruthers compounded the risk by engaging in an ongoing conspiracy to obstruct justice after she learned that Lafayette had discharged the gun in

20

Champaign, but before Officers Oberehim and Creel were shot. Rather than come forward to law enforcement at that time or attempt to get the gun out of Lafayette's hands,[8] she instead took steps to cover up Lafayette's possession of the pistol. Corruthers sought out the serial number of the Glock so that she could falsely report it stolen to the Indianapolis Metropolitan Police Department, while she discussed with Lafayette potentially purchasing a second firearm for him.

Then, when she found out that Lafayette was killed in a shooting where a police officer was also killed, she continued the conspiracy to obstruct justice during the subsequent investigation by lying about how Lafayette got the gun, even falsely claiming that she did not know Lafayette.[9] She maintained those lies from November of 2019, when she purchased the Glock for Lafayette, up through and including the date of her arrest on October 13, 2022.

---

[8] The defendant claims in her commentary that she "tried to buy the gun back to take it out of the hands of a convicted felon." R. 91 at 5. The United States is not aware of any such attempt. In fact, the text messages between Corruthers, Lewis, and Lafayette showed that they discussed Corruthers purchasing a second firearm for Lafayette after she purchased the Glock. She ultimately decided not to make the second purchase after learning that Lafayette had discharged the firearm, causing her to falsely report that the Glock had been stolen to avoid responsibility. These facts suggest Corruthers regretted the straw purchase because she was afraid she would get punished for the straw purchase, not because she had remorse for putting a gun in Lafayette's hands.

[9] In her commentary, Corruthers claims that her lies to ATF were a "spur of the moment decision." R. 91 at 7. The facts suggest otherwise. As set forth in the criminal complaint, Corruthers and Lewis had numerous phone calls with each other on May 19, 2021, after Lafayette used the Glock to murder Officer Oberheim. An ATF agent then contacted Corruthers around 3 pm on May 21, 2021, to interview her. Thereafter, Corruthers had five phone calls with Lewis before returning to her apartment at 4:10 p.m. and repeating the lie to an ATF Special Agent that the Glock had been stolen and adding the lie that she did not know who Lafayette was.

The seriousness of her offenses is not diminished simply because she could not have known the specific harm that would occur until it had already happened. *Cf. United States v. Heindenstrom*, 946 F.3d 57, 64 (1st Cir. 2019) (affirming upward variance where defendant's conduct led to victim's death despite no evidence of "strict but-for causation"). She clearly was aware that there was a risk that Lafayette would use the firearm improperly when she provided him with the gun and was even more aware of the risk when she later learned that he had discharged the firearm.

The relevant question in looking at the nature and circumstances of the offense is who should bear the risk of putting a firearm in a convicted felon's hands. Should the risk solely be borne by society, and more specifically, law enforcement officers like Officers Oberheim and Creel who might encounter that armed felon? Or should the risk also be borne by those individuals responsible for creating the risk in the first place and who are in the best position to minimize or eliminate the risk, in other words, the straw purchasers? The United States submits that, when a felon obtains a firearm from a straw purchaser, the straw purchaser should be put on notice that they will bear some of the responsibility and punishment if the firearm is used to commit an offense – and the more severe the offense, the more severe the punishment. *See, e.g., United States v. Ramirez*, 478 F. App'x 210, 213 (5th Cir. 2012) (affirming over 200% upward variance to statutory maximum ten-year sentence for straw purchaser "to protect residents of Mexico from being killed with rifles sent to the cartel by" the defendant); *United States v. Ruffin*, 448 F. App'x 482, 484 (5th Cir. 2011) (affirming 342% upward variance for defendant who made straw purchase of firearm later used in robbery and murder); *see also* USSG §§ 5K2.2

22

(authorizing increased sentence where death results) and 5K2.3 (authorizing increased sentence where physical injury resulted).[10]

## II.   History and Characteristics of the Defendant

### A.   No criminal history points

The defendant has no criminal history points, which is not surprising or extraordinary in a straw purchaser case. It is because Corruthers had no criminal history that she was in a position to be able to submit the false Form 4473, pass the required background check, and purchase the Glock firearm for convicted felon Lafayette. The Sentencing Commission has recently determined that zero-point offenders who purchase and transfer a firearm in connection with an offense are not entitled to an offense level reduction like some other zero-point offenders.[11] *See* U.S.S.G. § 4C1.1(a)(7).

After her arrest, the Court released Corruthers on conditions of bond. In support of her request for probation, Corruthers claims that the United States "attempted to revoke her bond at the Change of Plea hearing [and t]he Magistrate Judge recognized Ms. Corruther's [sic] exemplary behavior while on release and denied the motion." R. 91 at 14. Technically, the United States did not seek to revoke Corruthers's bond, but brought to the Magistrate Judge's attention 18 U.S.C. § 3143(a), which requires a judicial

---

[10] Corruthers posits in her commentary that the United States would not seek the same sentence if the person killed by the firearm was not a police officer. R. 91 at 14. The cases and guideline provisions cited above recognize, however, that an upward variance is appropriate for *any* murder, not just the murder of a police officer. Having said that, the guidelines also recognize that there is a greater harm to society when a victim is a law enforcement officer acting in his official capacity. *See* U.S.S.G. § 3A1.2 (Official Victim).

[11] Corruthers incorrectly asserts in her commentary that she "qualifies for the one-point reduction under new guidelines provision §4C1.1(a)." R. 91 at 8.

officer to detain a defendant who has pleaded guilty and is awaiting sentencing under certain circumstances. The Magistrate Judge found those circumstances were not present and released Corruthers on bond pending sentencing. Upon information and belief, the Magistrate Judge did not make any findings that the defendant's conduct on bond was "exemplary." Merely complying with the conditions of bond by maintaining employment and fulfilling family obligations should be expected and is not exceptional. *Cf. United States v. Laine*, 404 F. App'x 571, 574 (3d Cir. 2010) (noting that "[s]imple compliance with the conditions of supervised release are expected and not exceptional"), *holding abrogated by United States v. Melvin*, 978 F.3d 49 (3d Cir. 2020).

B.      Family ties and responsibilities

Corruthers points to her caregiving responsibilities for her two children as a reason for this Court to impose a reduced sentence, noting that their "caregiving will fall upon Ms. Corruthers' mother." R. 91 at 2. The Sentencing Commission has determined that a defendant's family ties and responsibilities are not ordinarily relevant in determining whether a sentence departure may be warranted. *See* U.S.S.G. § 5H1.6. This is because a defendant's family will always "suffer to some extent from the absence of a parent through incarceration." *Id.* at comment. (n.1(B)(ii)). "Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). A parent is, or at least should be aware of these potential consequences, when they commit a crime:

> Most families suffer emotional and financial harm when a parent is imprisoned. Any experienced district judge has heard about those effects many times and must recognize that those effects are consequences of the parent's crime, not the sentence imposed. During the Garys' joint sentencing hearing, Judge Reagan made that clear in responding to Stacie Gary's family-ties argument in mitigation. Mitigating arguments about such general hardships typically do not require any discussion at all.

*United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010) (affirming district court's refusal to impose more lenient sentences despite that both parents were facing prison).

## III.    Remaining Section 3553(a) Sentencing Factors

Finally, the other sentencing factors under Section 3553(a) support a sentence of 108 months of imprisonment.

### A.    Provide just punishment

Congress has determined that a sentence of imprisonment of up to five years for the crime of conspiracy to unlawfully purchase and transfer a firearm and up to twenty years for the crime of conspiracy to engage in misleading conduct would be just under the appropriate circumstances. Notably, since the time Corruthers committed her offenses, Congress passed a statute specifically criminalizing the straw purchasing of firearms and imposing a maximum penalty of up to fifteen years of imprisonment. 18 U.S.C. § 933 (eff. June 25, 2022). Although this law cannot be applied to Corruthers based on ex post facto concerns, this Court certainly may consider the law in determining an appropriate sentence to reflect Congress's current views on straw purchasing conduct. *See Concepcion*, 597 U.S. at 499 (noting sentencing courts may consider any relevant information at sentencing not specifically prohibited by Congress, including intervening changes in the law).

25

B.      Promote respect for the law

The United States submits that a 108-month sentence of imprisonment is necessary to promote respect for the law. While a sentence of imprisonment may be necessary to promote respect for the law following many criminal violations, it is particularly necessary here. More so than many other offenses, Corruthers's criminal conduct demonstrated a particular disrespect for the law – in fact, it was specifically calculated to evade the laws prohibiting felons from possessing firearms. Moreover, it involved filing a false report with a police department and then lying to a federal agent during a murder investigation. Tragically, Corruthers's conduct resulted in the death of a police officer and the shooting of another police officer. The requested sentence is necessary to promote respect for the law.

C.      Provide adequate deterrence to others

Unfortunately, straw purchasing of firearms is a serious and ongoing problem in our communities. *See, e.g., Abramski*, 573 U.S. at 180, n. 7 (citing ATF report noting that in several prior years almost half of all ATF firearm trafficking investigations involved straw purchasers). As noted above, Congress has recently attempted to deter straw purchasers by passing additional legislation specifically aimed at increasing the penalties for straw purchasers. *See* 18 U.S.C. § 933 (eff. June 25, 2022). No criminal statutes, however, will deter this conduct unless sentencing courts impose significant sentences for straw purchasing, especially where those straw purchases result in shooting deaths and subsequent obstruction of justice. Thus, a 108-month sentence is necessary here to adequately deter others who would engage in this conduct. This is especially true

26

because Corruthers engaged in this conduct for compensation. Would be straw purchasers need to be put on notice that the risks of this illegal conduct far outweigh the potential benefit of financial remuneration.

Deflecting the deterrent effect that her sentence will have on other straw purchasers, Corruthers claims that "specific deterrence is perhaps the most significant factor laid out in §3553(a)." R. 91 at 9. Corruthers further asserts that "any sentence will be deterrent." *Id.* Recent studies conducted by the Sentencing Commission have found, however, that only longer sentences provide adequate specific deterrence. The Commission conducted several analyses of recidivism rates among more than 25,000 people released from federal prisons in 2005, controlling for gender, age at time of release, race, and criminal history. Results indicated that individuals serving a prison sentence of 10 years or more were 29% to 45% less likely to recidivate than those serving shorter sentences. United States Sentencing Commission (2020), *Length of incarceration and Recidivism* at https://www.ussc.gov/research/research-reports/length-incarceration-and-recidivism. This finding was replicated in a 2022 report on more than 22,000 people released from federal prison in 2010. This analysis found that the odds of recidivism were 29% lower for individuals with sentences of 10 years or more when compared to a matched group of people who received shorter sentences. United States Sentencing Commission (2022), *Length of incarceration and recidivism* at https://www.ussc.gov/research/research-reports/length-incarceration-and-recidivism-2022.

Thus, Corruthers's citation to *Graham v. Fla.*, 560 U.S. 48, 70, (2010), which addressed a sentence of life without parole for a juvenile offender is inapposite. Here, the

United States is requesting a nine-year sentence for a 29-year-old defendant based on the Section 3553(a) factors – this is far from the juvenile life sentence in *Graham* that the Supreme Court majority determined lacked penological justification.

      D.      Avoid unwarranted sentencing disparities

      Section 3553(a)(6) directs that a sentencing court should consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Corruthers argues that imposing an above guidelines sentence would result in unwarranted sentencing disparities. R. 91 at 4. The United States contends that the opposite is true.

      Here, the Court has already sentenced co-defendant Lewis to 102 months of imprisonment. "[T]he guidelines are not a straitjacket. A district court is entitled, if it wishes, to apply the rule against unwarranted disparities to co-defendants' sentences." *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018) (citing *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) ("We are therefore open in all cases to an argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant . . . .")). Corruthers's and Lewis's criminal conduct in conspiring to provide Lafayette with the Glock was almost identical, with the exception that Corruthers made the actual purchase of the firearm and ammunition. Similarly, their criminal conduct in conspiring to obstruct justice was almost identical, with the exception that Corruthers actually falsely reported the firearm stolen to the Indianapolis Metropolitan Police Department and lied directly to ATF. On the other hand, after being charged, Lewis signed a cooperation agreement with the United States and agreed to testify against

Corruthers. "Disparate cooperation warrants disparate sentencing." *United States v. Solomon*, 892 F.3d 273, 279 (7th Cir. 2018) (citing *United States v. Orlando*, 819 F.3d 1016, 1026 (7th Cir. 2016)). This is true, "even when the less culpable of co-defendants finds himself staring at the harsher sentence." *Solomon,* 892 F.3d at 279 (citing *United States v. Boscarino*, 437 F.3d 634, 637–38 (7th Cir. 2006)).

A sentence of 18 months of probation here would create an unwarranted sentencing disparity between Corruthers and similarly situated defendants, including Lewis. Moreover, as the cases cited above demonstrate, district courts are more likely to impose above-guidelines sentences where the offense is related to gun violence. *See also United States v. Hendrix*, 74 F.4th 859, 870 (7th Cir. 2023) (affirming above-guidelines sentence, noting that "we repeatedly have held that district courts may consider the serious problem of gun violence in [a jurisdiction] in imposing stiff sentences on those who commit firearms offenses in the [jurisdiction]").

Although Corruthers cites sentences imposed on straw purchasers in other jurisdictions, R. 91 at 12, Corruthers does not claim in any of those cases that the defendants (1) conspired to provide the firearm to a convicted felon; (2) learned thereafter that the felon had discharged the illegally obtained firearm; (3) with that knowledge, conspired to falsely report the firearm stolen; and (4) after the firearm was used to murder a police officer, conspired to lie to federal agents to obstruct the investigation of the murder. The circumstances of this case are far from the typical straw purchaser case, as demonstrated at co-defendant Lewis's sentencing.

## <u>CONCLUSION</u>

The United States submits that the Section 3553(a) factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to avoid unwarranted sentence disparities among defendants, including co-defendant Lewis, with similar records who have been found guilty of similar conduct, and importantly, to afford adequate deterrence to other potential straw purchasers, requires a sentence of 108 months of imprisonment, to be followed by three years of supervised release,[12] no fine in light of the request for imprisonment, and a $200 special assessment.

Respectfully submitted,

GREGORY K. HARRIS
UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217-373-5891
eugene.miller@usdoj.gov

---

[12] The United States has no objection to the proposed conditions of supervised release listed in the PSR, and the defendant has likewise filed no objections to those listed conditions or the reasons offered in support of those conditions.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2023, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such to all

CM/ECF participants.

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov
